1

2

3

4

5

6

7

8           IN THE UNITED STATES DISTRICT COURT

9           FOR THE EASTERN DISTRICT OF CALIFORNIA

10   TREVOR McDONALD BIRD,

11           Petitioner,                    No. CIV S 03-2022 MCE EFB P

12       vs.

13   EDWARD ALAMEIDA, et al.,

14           Respondents.          FINDINGS AND RECOMMENDATIONS

15   _____/

16       Petitioner is a state prisoner, without counsel, seeking a writ of habeas corpus.  *See* 28

17   U.S.C. § 2254.  Respondent has answered and petitioner has filed a traverse.

18       On January 21, 1999, the state filed an information charging petitioner with murder of

19   Lloyd Lee Brown by personal use of deadly and dangerous weapons, namely, a tire, a gallon jug

20   of water and a board.  CT. at 12 - 13.   A jury found petitioner guilty as charged.  CT. at 192.

21   The court sentenced petitioner to 25 years to life in prison with the possibility of parole.  CT. at

22   290.

23       On appeal the judgment was affirmed in a reasoned decision.  Answer, Exhibit D.

24   Petitioner filed a petition for review in the California Supreme Court.  Answer, Exhibit E.  That

25   court summarily denied review.  Answer, Exhibit F.

26   ////

1

The following facts are taken from the state appellate court's opinion:

> On the evening of November 5, 1998, several offensive linemen from the Butte College football team went out for pizza with their coach. Among the players were Brett Portner, Bodie Dressler, Corey Fipps and Dereck Phillips. After pizza, these players went back to Phillips's room, where defendant joined them. Dressler. Phillips and defendant were drinking hard alcohol. They all decided to go look for a party. Joined by two girls who were his friends, Fipps drove them to downtown Chico.

> They first went to a fraternity house. The man outside stopped them, telling them they could not enter because it was a private social between the fraternity and a sorority. Phillips, who got hostile when drunk, became verbally abusive. Portner, Fipps and maybe defendant stepped in to stop him. As they walked down the street, Phillips got into another altercation with someone they passed. Fipps broke it up.

> Portner, Phillips and Fipps went into an alley to urinate. A man in a sleeping bag said "hey, don't pee over here" or "hey, you jerks, I'm sleeping here." Portner apologized and rejoined the others. Phillips said, "what did you say, you bum" and "why don't you get. a fucking job?" The man, later identified as Lloyd Brown, answered, " I'm trying." Phillips kicked Brown; Fipps grabbed Phillips and they left.

> Phillips told defendant there was a bum back there and defendant said, "[l]et's go back." Fipps ran ahead and picked up Brown, telling him, "these guys are drunk. Why don't you just get out of here. They're going to mess with you." Fipps told Phillips the guy was homeless and not to mess with him. Just then defendant went by and struck Brown in the head, knocking him down. Defendant began messing with Brown's backpack and Fipps grabbed him. Then Phillips messed with the backpack and Fipps grabbed him. Fipps then announced he was leaving.

> Scared, Fipps ran back to the others and said they were beating up the homeless man. Portner and Dressler told Fipps they did not need to get involved; the police would come.

> Shannon G. lived nearby with Nicky W. She heard yelling and looked out her window; she saw two men yelling at a man on the ground, "why did you call me a punk ass?" They began to kick the man on the ground; she could hear the kicks landing. Phillips said stand him up and defendant lifted Brown; as he let go, Brown fell to the ground. Brown did not throw any punches. While Phillips and defendant were still kicking Brown, Nicky called 911. Shannon thought defendant was leaving, but he returned with a board; lifting it over his head, he beat Brown at least 10 times. Brown was not moving. Phillips dropped a five gallon water bottle

on Brown, making a thud. Then Phillips got a spare tire from a truck and dropped it on Brown.

Nicky described the fight over the phone to the 911 operator: "there are three males kicking the crap out of some guy, and he's totally down on the ground. They just keep beating him up. Like, he's, the guy is on the ground and they can't get him up, and they're, they're kicking him." She described the kicking, and then the hitting with the water bottle, the board and the tire. She described two assailants.

Brian F. lived next door and heard metal clanging against concrete and yelling. He saw two men brutally beating a man on the ground. The man on the ground did not move. The assailants picked him up and dropped him, hit him with a fence board, a pipe or bat, a spare tire and a five-gallon water jug. They yelled, "why did you call me a bitch?"

When police sirens sounded, Phillips and defendant ran away. The police followed Phillips; a police car got in front of him and he dropped to his knees. Defendant ran and climbed onto a roof. The police set up a perimeter and told defendant to keep his hands where they could see them. Defendant put his hands out and rolled off the roof.

A criminalist examined the water bottle and found hair, tissue, bloodstains and two dents. There were bloodstains and tissue on the tire. He pieced together five pieces of board that had originally been one piece. There were bloodstained smears or splatters on the board, some had been deposited after the board broke. There were bloodstains on defendant's shoes and his pants.

Gwen Hall, a forensic pathologist, testified to 27 distinct injuries to Brown. There were at least five blows to the head, which would be fatal. Her primary diagnosis was severe cranial cerebral trauma; trauma to the skull and brain, consistent with a heavy object being dropped. There were injuries to the chest, consistent with being hit by a board. The fatty tissue and liver were lacerated and there were rib fractures. These injuries could be fatal over the long term. Dr. Hall found approximately five fatal injuries, two to the head and three to the chest. The injuries to the chest contributed to the cause of death by producing further injury and impairing Brown's breathing. Brown was beaten to death.

In defense Deidra T., one of the girls present that night, testified defendant helped break up Phillips's first two altercations. She had told the officer Phillips and defendant were "way beyond drunk," but she did not think they were. She saw defendant fall down that night while kicking cans.

////

3

> Raymond Deutsch, a doctor specializing in addiction medicine, testified about the fight or flight reaction. The old brain, unchanged from the time of the dinosaurs, was responsible for instinctual behavior and survival. The new brain is responsible for judging the pros and cons of behavior. One of the wired-in instinctual behaviors is the fear response or fight or flight response. It occurs when an animal is subjected to a frightening stimulus, responding with an increase in heart rate, hair standing up, dilated pupils, freezing and then a trigger. Once the trigger goes, the reaction continues until completion.
>
> Based on the stipulation that defendant had a blood alcohol level of .165 at 12:31 a.m., Dr. Deutsch opined defendant's blood alcohol level was .18 during the fight. That level was moderate to high impairment. Alcohol impairs judgment and lowers the threshold for a reaction.
>
> In Dr. Deutsch's opinion, the incident was compatible with a fight reaction. It was a single event fight in which it was not necessary to invoke cortical thinking process and judgment. The fight reaction tends to be initiated by various triggers and tends to occur because of the lower threshold. It proceeds in an all-or-none fashion until completion.

Answer, Exhibit D.

Habeas Corpus Standards

This court cannot grant habeas relief unless the state court's adjudication resulted in a decision that was contrary to or an unreasonable application of federal law as clearly established by the United States Supreme Court or in a decision that was based on an unreasonable determination of the facts in light of the evidence. 28 U.S.C. § 2254(d)(1), (2).

When a petitioner "challenges the state court's findings based entirely on the state record," a federal court must first determine whether the adjudication resulted in a decision based on an unreasonable determination of the facts. *Taylor v. Maddox*, 366 F.3d 992, 999 (9th Cir. 2004). A state court's determination is unreasonable if the court failed to make a factual finding when it should have, the state court's factual finding is made under an incorrect legal standard or when the fact-finding process is defective. *Taylor*, 366 F.3d 992. If a federal court finds the state court's determination is reasonable, the court must presume it is correct, although the determination may be rebutted by clear and convincing evidence. *Id.* at 999; 28 U.S.C.

4

1    § 2254(e)(1).

2        When a petitioner challenges a state court's legal determinations, the court must

3    determine whether it is contrary to or an unreasonable application of clearly established federal

4    law. 28 U.S.C. § 2254(d)(1). A decision is contrary to clearly established federal law if the state

5    court applies incorrect legal authority, or if it applies correct authority to a case involving facts

6    materially indistinguishable from those in a controlling case, but nonetheless reaches a different

7    result. *Williams v. Taylor*, 529 U.S. 362, 413-14 (2000). A decision involves an unreasonable

8    application of federal law if the state court identifies the correct governing legal principle but

9    applies it to the facts of the prisoner's case in a manner that is "objectively unreasonable."

10   *Lockyer v. Andrade*, 538 U.S. 63, 75 (2003). "Clearly established federal law" is defined as the

11   holdings of the United States Supreme Court existing when the state court issued its decision.

12   *Williams*, 529 U.S. at 412. Circuit law is "persuasive authority" for purposes of determining

13   whether a state court decision is an unreasonable application of Supreme Court law. *Clark v.*

14   *Murphy*, 331 F.3d 1062, 1069 (9th Cir. 2003); *Duhaime v. Ducharme*, 200 F.3d 597, 600-01 (9th

15   Cir. 1999).

16       The court examines the last reasoned decision of a state court as the basis of the state

17   court's judgment. *Ylst v. Nunnemaker*, 501 U.S. 797, 803-04 (1991). When no state court has

18   explained its decision, a federal court determines whether the decision contravenes or

19   unreasonably applies clearly established federal law without independently deciding the

20   contested legal question. *Wilson v. Czerniak*, 355 F.3d 1151, 1154 (9th Cir. 2004).

21   <u>Petitioner's Claims</u>

22       Petitioner claims that instructing the jury on the law of principals violated due process by

23   permitting the jury to find him guilty on an aiding and abetting theory without requiring the jury

24   to find that petitioner intended to aid and abet the murder. The appellate court determined that

25   the trial court did not give an aiding and abetting instruction but it did instruct the jury not to

26   speculate about the other person involved. Answer, Exhibit E, 11-12. The appellate court

5

1  concluded that nothing in the jury instructions permitted the jury to find petitioner guilty based

2  solely on his co-defendant's actions, and so there was no reasonable likelihood that the jury

3  found petitioner guilty of aiding and abetting first degree murder without the intent necessary for

4  aiding and abetting.  Answer, Exhibit E.

5        Due process requires the state to prove an accused's guilt beyond a reasonable doubt.  *In*

6  *re Winship*, 397 U.S. 358, 362-63 (1970).  To return a verdict of guilty, a jury must find that

7  every element of the crime with which the defendant is charged is proved beyond a reasonable

8  doubt and the jury instructions must give effect to this requirement.  *Sullivan v. Louisiana*, 508

9  U.S. 275, 277-278 (1993); *Sandstrom v. Montana*, 442 U.S. 510, 520-21 (1979).   Therefore, the

10  failure to instruct on an essential element of the crime charged violates due process.  *See Neder*

11  *v. United States*, 527 U.S. 9, 8 (1999); *Johnson v. United States*, 520 U.S. 461, 465 (1997).

12        In California, murder perpetrated by "torture, or by any other kind of willful, deliberate,

13  and premeditated killing," is first degree murder.  Cal. Pen. Code §§ 187, 189 (West 1988).  For

14  the jury to convict petitioner of murder by torture, the prosecution had to prove that petitioner

15  committed a series of violent acts intended to cause extreme pain and suffering for the purpose

16  of revenge, extortion or any sadistic purpose.  *People v. Proctor*, 15 Cal.Rptr.2d 340, 356 (Cal.

17  1992); *People v. Baker*, 98 Cal.App.4th 1217, 1223 (Cal. 2002).  The prosecution did not have to

18  prove that any single act, itself, caused death or that petitioner intended to kill.  *Proctor*, 15

19  Cal.Rptr.2d at 356;  *People v. Demond*, 130 Cal.Rptr. 590, 595  (Cal. App. 1976).  For the jury to

20  find petitioner guilty of premeditated murder, the prosecution had to prove that before acting,

21  petitioner considered a course of action, weighed the considerations for and against it, and then

22  acted so as to cause the victim's death.  *People v. Mayfield*, 60 Cal.Rptr.2d 1, 59  (Cal. 1997).

23        Principals are all persons involved in a crime, whether they directly commit it or merely

24  aid and abet its commission.  *People v. Cook*, 72 Cal.Rptr.2d 183, 188 (Cal. App. 1998).  An

25  aider and abetter is a principal who "is present at the scene of the crime, but *does not engage in*

26  *the criminal conduct*; he merely assists the [other] principal . . . in committing the crime."  *Cook*,

6

72 Cal.Rptr.2d at 188 (emphasis in original).  Consequently, it must be proved that the aider and abetter acts with "knowledge of the criminal purpose of the perpetrator *and* with an intent or purpose either of committing, or of encouraging or facilitating commission of, the offense." *Id*. But if the defendant performed an element of the offense, the jury need not be instructed on aiding and abetting, even if an accomplice performed other acts that completed the crime." *Id.* at 187-88.

Through eye-witnesses, the prosecution adduced evidence that petitioner and his co-defendant, Phillips, repeatedly kicked the victim in the head, shoulder and torso.  The eye-witness testimony also adduced that petitioner:  left the victim momentarily to get a board with which he returned and then beat the victim; that Phillips momentarily left once to get a spare tire from a nearby truck, with which he returned and dropped on the victim; and that he again left to get a 5-gallon water jug, with which he also returned and used to beat the victim.  RT. at 240-254, 270-279.  Petitioner and Phillips inflicted 27 separate injuries, including a fractured facial bone which passed into the cranial wall,[1] broken bones around his left eye, a broken jawbone, fractured ribs,  bruising on his neck and face, brain hemorrhage and multiple skull fractures.  RT. at 390, 392, 394, 399, 402, 403, 405.  At least five distinct injuries could have been fatal, including the fractured ribs, likely caused by blows with the board, and two of the head injuries, likely caused by kicking.  RT. at  403-405,  407-08,

The prosecution requested the aiding and abetting instruction over defense counsel's objection.  RT. at 617, 661.  The court said that the evidence did not warrant an aiding and abetting instruction but the jury should be instructed on principals.  RT. at 676.  Therefore, in addition to accurate premeditated murder and murder by torture instructions, the court gave an instruction on the law of principals:

////

---

[1] This is the part of the skull that holds the brain.  RT at 392.

1    Persons who are involved in committing a crime are referred to as principals in
     that crime.  Each principal regardless of the extent or manner of participation is
2    equally guilty.

3    RT. at 676, 744.

4         The evidence demonstrated that petitioner actively participated in the beating and the

5    court did not instruct the jury on aiding and abetting.  Indeed, from the facts as recited in the

6    state appellate court's opinion, it was defendant who said  "[l]et's go back."  Answer, Exhibit D.

7    It was defendant who, shortly after Fipps told Phillips the guy was homeless and not to mess

8    with him, "struck Brown in the head, knocking him down."  *Id.*  It was defendant who "began

9    messing with Brown's backpack and Fipps grabbed him."  *Id.*  It was defendant who "lifted

10   Brown; as he let go, Brown fell to the ground."  *Id.*  The facts as found by the state court also

11   show that "[w]hile Phillips and defendant were still kicking Brown, Nicky [an eye witness]

12   called 911."  *Id.*  It was defendant who "returned with a board; lifting it over his head, he beat

13   Brown at least 10 times."  *Id.*  The evidence further adduced that:  "five pieces of board that had

14   originally been one piece.  There were bloodstained smears or splatters on the board, some had

15   been deposited after the board broke.  There were bloodstains on defendant's shoes and his

16   pants."  *Id.*  Although the prosecutor once stated that when petitioner was not participating he

17   was "standing right there," aiding and abetting was not the foundation of the prosecution's

18   argument.  RT. at 736.   Defense counsel conceded that defendant participated in the beating, but

19   argued that petitioner lacked  the requisite intent for murder.  RT. at 661, 704-711, 712-728.

20   Therefore, there was no basis for the jury to convict petitioner on an aiding and abetting theory,

21   much less an aiding and abetting theory for which it had an incomplete instruction.[2]  The state

22   _____

23        [2] Petitioner submitted notices of supplemental authority to draw the court's attention to
     *Martinez v. Garcia*, 379 F.3d 1034 (9th Cir. 2004) and  *Gibson v. Ortiz*, 387 F.3d 812 (9th Cir.
24   2004).  *Gibson* addresses the problem of an instruction that diluted the state's burden of proof
     through permissible inferences.  *Gibson*, 387 F.3d at 822.  *Martinez* addresses the problem of a
25   transferred intent instruction and confusing verdict form leading to the possibility that the
     defendant was convicted on a ground that cannot withstand constitutional scrutiny.  *Martinez*,
26   379 F.3d at 1035-36, 1039.  Here, despite petitioner's insistence to the contrary, no faulty

8

court's fact findings were not unreasonable and its legal determination was not contrary to or an unreasonable application of clearly established federal law.  Petitioner is not entitled to relief on this claim.

Petitioner also claims that the trial court violated his Sixth Amendment right to counsel by instructing the jury on aiding and abetting after the parties finished their closing arguments. The state court determined that the modified principals instruction did not introduce the theory of aiding and abetting.  Answer, Exhibit B at 15.

The right to counsel encompasses the right to make a closing argument based on all theories supported by the evidence.  *Herring v. New York*, 422 U.S. 853, 865 (1975); *U.S. v. Miguel*, 338 F.3d 995, 100-1001 (9th Cir. 2003).  Trial counsel did not want an aiding and abetting instruction and the trial court did not give one.  The state court's determination is not contrary to or an unreasonable application of clearly established federal law.  Petitioner is not entitled to relief on this claim.

Accordingly, it is hereby RECOMMENDED that petitioner's application for a writ of habeas corpus be denied.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within twenty days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties.  Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."  Failure to file objections within the specified time may waive the right to appeal the District Court's order. *Turner v. Duncan*, 158 F.3d 449, 455 (9th Cir. 1998); *Martinez v. Ylst*, 951 F.2d 1153 (9th Cir. 1991).

Dated:  November 13, 2006.

EDMUND F. BRENNAN
UNITED STATES MAGISTRATE JUDGE

---

instruction was given.